UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BRETT H. GREEN,

        Plaintiff,

v.                                Case No. 8:07-cv-969-T-17EAJ

DEPUTY KENNETH R. GARRIS,[1]

        Respondent.

_____/

## ORDER

This cause is before the Court on Plaintiff Green's motion for summary judgment (Doc. No. 49); Defendant Deputy Garris' cross-motion for summary judgment (Doc. No. 50); and the parties' responses to the motions for summary judgment. (Doc. Nos. 51, 52). A review of the entire record, including motions, exhibits, and affidavits demonstrate that Defendant Garris' motion for summary judgment must be granted.

UNDISPUTED FACTS[2]

Both Deputy Garris and Deputy Joseph DiStefano were involved in Plaintiff Green's arrest which occurred about 3:00 a.m. on May 22, 2005. Deputy Garris and Deputy DiStefano were "on duty" lawfully performing their functions as deputies in the Pinellas County Sheriff's Office; both were wearing the uniform of a Pinellas County Sheriffs Deputy; and,

---

[1] Deputy Garris is the only remaining Defendant. Sheriff Jim Coats and the Pinellas County Sheriff's Department were dismissed on July 23, 2007. (See doc. No. 18).

[2] Plaintiff Green states, in his motion for summary judgment, that he does not dispute the fact that on May 22, 2005, he was involved in a pursuit and arrest with Deputy Kenneth R. Garris and was tackled by a citizen in a passing vehicle. Green states that he does not dispute the crimes for which he was being pursued, detained, arrested, and convicted.

both were driving separate vehicles marked as Pinellas County Sheriff's units which, during the pursuit and arrest, had activated lights and sirens. (Garris Affidavit ¶ 4; DiStefano Affidavit ¶ 2).

Due to a string of burglaries in the area of U.S. Highway 19 North in Pinellas County, Florida, Deputy DiStefano set up surveillance near the businesses located at 35253 U.S. Highway 19 North. At approximately 2:20 a.m. on the morning of May 22, 2005, the deputy noticed a vehicle (a 1994 green Ford Tempo, tag #Q606LL) pulling into the parking lot.  The vehicle matched a bulletin which had been issued in reference to a suspect named Brett H. Green (DiStefano Affidavit ¶ 2-3).

Deputy DiStefano had parked his vehicle behind the businesses and was hidden from view. The suspect vehicle circled the parking lot and then parked directly in front of a hair salon. The deputy saw the suspect exit his vehicle and try to open the front door of the hair salon. At that point, Deputy DiStefano drove his marked cruiser around to the front of the shopping complex and saw the suspect standing with an object in his raised right hand (DiStefano Affidavit ¶ 4).

As Deputy DiStefano approached, the suspect "jumped back" into his car and drove off very quickly and in a reckless manner. When the Deputy activated the overhead lights, the suspect sped even faster and when the suspect still failed to pull over, the Deputy initiated the siren. Deputy DiStefano notified the Pinellas County Sheriffs Office's dispatcher that he was in pursuit. Several vehicles were stopped for a red light at the intersection of U.S. 19 and Alderman Road. As the suspect's vehicle approached the intersection he drove up on the outside concrete island, almost striking a vehicle in the outside lane, and then continued north through the red light. The suspect's driving was extremely reckless as he was weaving

2

in and out of traffic at speeds of up to 85 miles per hour. As the suspect passed Closterman Road at U.S. 19, he began throwing concrete bricks at the Sheriffs vehicle through the rear window of his vehicle.[3] That window was already broken. (DiStefano Affidavit ¶ 5). The suspect continued through the intersection north on U.S. 19, throwing more objects out of his window, causing the deputy to swerve and maneuver his cruiser in order to avoid being struck (DiStefano Affidavit ¶ 6).

Deputy Garris responded to Deputy DiStefano's radio transmission. Deputy Garris proceeded eastbound on Closterman Road and as he approached the intersection of U.S. 19 he saw the Plaintiff, Brett Green, pass at a high rate of speed followed by Deputy DiStefano. Deputy Garris pulled behind Deputy DiStefano's unit and joined in the pursuit (Garris Affidavit 15-6; DiStefano Affidavit ¶ 8).

When Green reached the intersection of U.S. 19 and Martin Luther King Boulevard in Tarpon Springs, Florida, Green attempted a left turn, but because of his high rate of speed turned back into the "through lane." At that point, Deputy DiStefano initiated what is known as a "PIT" maneuver[4] which spun Green's vehicle approximately 360˚.  Green's vehicle then came to a halt in front of Deputy Garris' vehicle and apparently stalled. (Garris Affidavit ¶ 8; DiStefano Affidavit ¶ 9). Deputy DiStefano exited his vehicle, unholstered his service weapon and ordered Green out of Green's car.

Green "looked the deputy in the eye," re-started his vehicle, backed up and turned around heading south. This move allowed Green to "bail' out of his vehicle and flee on foot.

---

[3] These bricks were later found to match objects used to smash glass doors in at least two of the other burglaries under investigation. (DiStefano Affidavit ¶ 5).

[4] A PIT maneuver is a method by which one car pursuing another can force the pursued vehicle to abruptly turn sideways, or in this case, in a circle.

Green's vehicle, however, was now driverless but still in gear and so it rolled south onto U.S. 19, causing a serious threat of collision and bodily harm to passing motorists. Deputy DiStefano ran after the suspect's vehicle as it began to cross the median into traffic. The deputy was able to catch up to the vehicle and turn the steering wheel so that it moved back into the southbound lane where it rolled into a ditch. (Garris Affidavit ¶ 10; Distefano Affidavit ¶ 10).

Meanwhile, Deputy Garris pursued Green on foot. Green ran approximately one-quarter of a block where he unsuccessfully attempted to jump a stockade fence. The suspect then ran back toward U.S. 19 into and through a parking lot.  In the parking lot, Green tried to force his way into (i.e., "car jack") a vehicle with a female driver. A few seconds later, a private citizen tackled Green to the ground; Green was then face down with his hands between himself and the ground (Garris Affidavit ¶ 11; see also Green's description of these events in his *"Notice of Intent to Sue"* which is attached as Exhibit "A" to his "Rebuttal to Defendant's Response of Tampered Documents" [Docket No. 44] and Complaint [Docket No.2]).

Once Green was handcuffed, he was transported and eventually booked into the Pinellas County Jail on two counts of burglary contrary to Florida Statutes §810.02 and 810.02(3); possession of burglary tools contrary to Florida Statute §810.06; aggravated assault on a law enforcement officer with a deadly weapon contrary to Florida Statute §784.021; throwing or shooting an object at an occupied vehicle contrary to Florida Statute §740.19; aggravated fleeing and alluding contrary to Florida Statute §316.1935; culpable negligence contrary to Florida Statute §784.05; and attempted robbery (for the carjacking) contrary to Florida Statute §812.133.  Deputy DiStefano also cited Green for the moving traffic violations of fleeing and eluding under Uniform Traffic Citation 3905-DXP, speeding under

4

Uniform Traffic Citation 3906-DXP and for failure to stop for a red light under Uniform Traffic Citation 3907-DXP. (Garris Affidavit ¶ 12; DiStefano Affidavit ¶ 16-17, 20).

On July 13, 2005 the Pinellas County Circuit Court adjudicated Green guilty of burglary, attempted burglary, aggravated assault on a law enforcement officer, fleeing/eluding and attempted carjacking (certified copies of the judgments are attached to Doc. No. 50 as Exhibits D-F). Green did not appeal these judgments. He is currently incarcerated in the Florida Department of Corrections as a result of the conviction and sentence.

Procedural History Following the Conviction

Green filed the present civil rights complaint on June 6, 2007, in the Circuit Court for the Sixth Judicial Circuit, Pinellas County, Florida.  Defendants removed the case to this Court on June 6, 2007.  (Doc. Nos. 1, 2).

Green alleges, in his complaint:

1. This is an action for damages in excess of fifteen thousand dollars, $15,000.00.

2. Plaintiff resides at Sumter Correctional Institution, 9544 Cr. 476B, Bushnell, Florida, 33513.

3. The Defendants' various residences are unknown to the Plaintiff but will be served by personal service summons at the Pinellas County Sheriff's Department, 10750 Ulmerton Rd., Largo Florida 33779.

4. On May 22, 2005, the Plaintiff was involved in a pursuit and arrest by the Pinellas County Sheriff's Department.  All the reports concur that the Plaintiff was tackled by a citizen, Lester A. Rodriguez, and then held face down on the ground by Mr. Rodriguez and as many as seven (7) Pinellas County Sheriff's Deputies while Deputy Kenneth R. Garris deployed his taser and initiated a "drive stun."  The reports vary stating that the Plaintiff was drive stunned in the back of the neck, and/or several times.

5. The facts are that the Plaintiff was held face down on the ground with his right arm pinned under him by as many as eight (8) grown men while

5

he was "drive stunned" with a taser by Deputy Garris between fifteen (15) and twenty (20) times. The taser signature/strike marks were photographed by Spec. Sandee A. Jacobs and two days later by the Public Defender's Office. (see Exhibit A, copies of photographs).  the excessive taser strikes while the Plaintiff was subdued by eight (8) men face down on the ground amount to "excessive force" and "cruel and unusual punishment" that form the basis for this action.

6. The "excessive force" and "cruel and unusual punishment" caused the Plaintiff to suffer bodily injury with severe pain, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, and loss of the ability to earn money.  The losses are either permanent or continuing in nature and the Plaintiff will suffer losses in the future. The excessive taser strikes also caused "Deep Burns" which should have been described and treated as second and third-degree burns. The Plaintiff was booked into the Pinellas County Jail without recieving [sic] any medical treatment by any emergency medical personal [sic] or medical staff from the Sheriff's Department.  The photograph of the burns clearly show destruction of the epidermis and much of the dermis with a whitish exudate including areas that are black and charred.  The medical distinction between deep second and third-degree burns can sometimes only be made after three (3) to five (5) days of observation. This was never documented in the instant case because the Plaintiff never recieved [sic] any medical treatment.   The lack of treatment resulted in the Plaintiff suffering excessive pain and the resulting infection known as streptococcal cellulitis with swelling and pustulate discharge, scarring, and prolonged healing that lasted for weeks because the standard inpatient and/or outpatient "burn treatment criteria" was never followed or administered.

7. As a result, the Plaintiff requests judgment against the Defendants for damages, pain & suffering, costs of suit, and any other relief as the Court may deem proper.

8. The Plaintiff, Brett H. Green, demands a jury trial in the above-entitled action.[5]

---

[5] Green also describes his arrest in his *"Notice of Intent to Site"* as follows: "On May 22nd, 2005 the Plaintiff was involved in a pursuit and arrest by the Pinellas County Sheriffs Department. All the reports concur that the Plaintiff was tackled by a citizen, Lester A. Rodriguez and then held on the ground, face down, by Mr. Rodriguez, and as many as seven (7) Pinellas County Sheriffs deputy's while Deputy Kenneth R. Garris deployed his taser and initiated a 'drive stun' until the Plaintiff complied with being cuffed. . .The facts are as follows that the Plaintiff was pinned to the ground with as many as eight (8) grown men on top of him and was unable to move his right arm because it was pinned under him by the citizen and deputies on top of him" (Plaintiff's *Notice of Intent to Sue)*. Green's unsworn Complaint describes these events in a similar manner

Green seeks money damages.

The May 14, 2007 complaint, (Doc. No. 2) was not signed under penalty of perjury. On June 6, 2007, Defendant Pinellas County Sheriff's Department filed a motion to dismiss (Doc. No. 3) with a memorandum of law in support (Doc. No. 4). The Court partially granted the motion to dismiss on July 23, 2007 (Doc. No. 18). In the order, the Court stated that Defendant Garris was the only remaining defendant.

Green contends, in his motion for summary judgment, that Deputy Garris violated his Fourth Amendment right to be free from excessive use of force during an arrest by tasering him unnecessarily and as many as "15 to 20 times." In support, Green submits photographs taken immediately after his arrest. (Doc. No. 54)

Deputy Garris contends that he is entitled to summary judgment based on qualified immunity and that his use of force was reasonable and necessary under the circumstances, that his actions were in compliance with the Sheriff of Pinellas County's guidelines on the use of force during an arrest and consistent with his prior training in the use of force and the use of stun guns. (Garris Affidavit ¶ 17).

<strong>Standard of Review for Qualified Immunity</strong>

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To be even potentially eligible for qualified immunity, the official has the burden of establishing

---

(Complaint at ¶ 5). Green does not allege in his Complaint that he complied with being handcuffed.

7

that he was acting 'within the scope of his discretionary authority.' " *O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir.2004) (quoting *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir.1995)).

Once it is established that the Defendants were acting within their discretionary authority, the burden shifts to the Plaintiff to prove that qualified immunity is not warranted. *Vinyard*, 311 F.3d at 1346. The Supreme Court has articulated a two-part test in the qualified immunity analysis. First, the court must determine whether the plaintiff's allegations establish a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (stating that the court must evaluate the complaint to determine if, assuming the allegations are true, it pleads a cognizable violation of the constitution). If this is answered in the affirmative, the court's next step is to determine whether the right in question was clearly established. *Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id.* at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (stating that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.")). In essence, a defendant is entitled to "fair warning" that his alleged conduct would be unconstitutional. *Hope*, 536 U.S. at 741.

Green must satisfy both prongs set out in *Saucier* to establish the inappropriateness of extending qualified immunity to any Defendant in this matter. As the Supreme Court has announced: "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier* at 202.

8

In the Eleventh Circuit, "for the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors in the defendants' place, that what he is doing violates federal law." *Jenkins v. Talladega City Board of Education*, 115 F.3d 821, 823 (11th Cir. 1997)(en banc)(citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"[A] public official is entitled to qualified immunity unless, at the time of the incident, the preexisting law dictates, that is, truly compel[s], the conclusion for all reasonable similarly situated public officials that what [the official] was doing violated [the plaintiff's] federal rights in the circumstance." *Wilson v. Zellner*, 200 F.Supp. 2d 1356, 1360 (M.D. Fla. 2002), (citing *Marsh v. Butler County*, 268 F.3d 1014, 1030-31 (11th Cir. 2001)(en banc)).

Defendant Garris Is Entitled to Qualified Immunity

It is undisputed that on, May 22, 2005, Defendant Officer Garris was acting within his discretionary authority as a law enforcement officer. Therefore, the burden shifts to Green to show that qualified immunity is not warranted. Green must demonstrate that his allegations establish a cognizable constitutional violation and that the right in question (in this case, the Fourth Amendment right to be free of excessive force during an arrest) was clearly established on May 22, 2005, so that a reasonable officer would have known that what he was doing violated federal law.

All claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen are analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Whether the force is reasonable hinges on the facts and circumstances of each case,

9

"including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The "reasonableness" of the use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* The "calculus of reasonableness" must embody allowance for the fact that police officers are often forced to make split-second judgments in tense, uncertain, and rapidly changing situations. *Id.* at 396-97.

Taking the facts in the light most favorable to Plaintiff Green, the record in the present case demonstrates that Green cannot argue that the many felonies he committed that led to his arrest (especially the felonies of aggravated assault on a law enforcement officer [Florida Statute §784.021], aggravated fleeing and alluding [Florida Statute §316.1935]; and attempted carjacking  [Florida Statute §812.133]) were anything but serious, reckless and posed significant danger to himself, the arresting officers and others. The Eleventh Circuit has stated that "when an officer lawfully arrests an individual for the commission of a crime, *no matter how minor the offense,* the officer is entitled under controlling Supreme Court precedent to effectuate a full custodial arrest." *Lee* v. *Ferraro,*  284 F.3d 1188, 1196 (11th Cir.2002) (emphasis added); *see also* Fla. Stat. § 901.15(1) ("A law enforcement officer may arrest a person without a warrant when ... the person has committed a felony or misdemeanor ... in the presence of an officer."). The right to make a full custodial arrest comes with it "the right to use some degree of physical coercion or threat thereof to effect it." *Saucier,* 533 U.S. 194 at 204.

The second *Graham* element is Green's perceived threat to the officers and to others. Likewise, this second element requires very little analysis because the record reveals facts that  would reasonably lead Deputy Garris to conclude that Green posed a serious

10

threat. Green had already refused to yield his vehicle despite the blaring lights and sirens on the marked sheriff's vehicles. In addition to fleeing in an extremely reckless manner, he had also committed aggravated assault by throwing bricks at Deputy DiStefano, attempted a carjacking and had "bailed" from his engaged vehicle. Therefore, Deputy Garris believed Green was capable of causing great bodily harm and property damage and that Green needed to be handcuffed to avoid any further attempts at fleeing  (Garris Affidavit ¶ 15; DiStefano Affidavit ¶ 19; Deputy Garris' Answers to the Plaintiffs Interrogatories #7 and 25).

These facts,  which are very similar to the facts in *Fernandez v. City of Cooper City,* 207 F.Supp.2d 1371 (S.D. Fla. 2002), could lead a reasonable officer in Deputy Garris' position to perceive Green as a significant threat. *Fernandez,* 207 F.Supp.2d at 1377. Furthermore,  Green's mental condition *may* have been unstable. In fact, the Pinellas County Circuit Court later questioned Green's mental health and ordered a psychological evaluation (see the Joint Order for a Psychological Evaluation at Exhibit G). As the Southern District determined in *Fernandez,* 207 F.Supp.2d at 1376, such a scenario also presents a heightened possibility of threat to the officers and others.  The fact that Green's mental condition *may* have been unstable should be sufficient to add support to the "perceived" threat.[6]

Green was resisting arrest by the time Deputy Garris used his taser, as Green  had already refused to surrender until he was physically tackled. Even if one wholly ignores Green's reckless and dangerous conduct up until the point he was tackled, Green's refusal to comply with the officers' demands that he place his hands behind his back in order to be

---

[6] Green's mental state was evident from his comment to Deputy DiStefano. When Deputy DiStefano explained to Green that he could have killed somebody by allowing his driverless car to roll into traffic, Green calmly responded: "Good, I wish I would have murdered someone, then I'd get the death penalty." (DiStefano Affidavit ¶ 14).

handcuffed (for whatever reason) could reasonably lead a deputy to conclude that Green was continuing to physically resist arrest.

In *Fernandez, supra,* the Southern District reviewed the facts in a light most favorable to the plaintiff by ignoring the suspect's alleged battery on a law enforcement officer and focused instead only on the suspect's actions in resisting being handcuffed. *Fernandez,* 207 F.Supp. 2d at 1376. The act of resisting was itself serious enough to cause the Southern District to find that defendant officers were acting reasonably is using force. *Id.* (citing *Goodman* v. *Town of Golden Beach,* 988 F.Supp. 1450,1456-1457 (S.D. Fla.1997)).

Applying the *Graham* factors to the record evidence shows that Deputy Garris' determination that force was needed to "cuff" Green (regardless of whether viewed "from the scene" or with "20/20 hindsight") was reasonable. Green's crimes were severe; he posed an immediate threat to the safety of the officers and others; and he was actively resisting arrest by, at the very least, attempting to evade arrest.

The next *Graham* factor to determine is whether the force used was reasonable in relationship to the need for force. The record in this case demonstrates that the "need" for force against Green was very great. This is important because the greater the need for force, the greater the amount of force allowed. *See, e.g., Brosseau v. Haugen,* 543 U.S. 194 (2004) (while it is unreasonable for police officer to seize unarmed, non-dangerous suspect by shooting him dead; where officer has probable cause to believe that suspect poses threat of serious physical harm, either to officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force).

In light of the fact that cases such as *Brosseau* (and others as described below) could have permitted Deputy Garris the use of deadly force under the circumstances, the

12

amount of force actually used was less than proportional to the need.  First, the amount of force used was objectively reasonable based on the competent evidence. The only competent verifiable evidence in the record shows that only Deputy Stemboroski and Deputy DiStefano held the uncooperative Green on the ground while Deputy Garris used the taser to effectuate the arrest. No evidence exists to support Plaintiffs unsupported assertion that either "7" or "8"[71] deputies were holding him on the ground.

The ACISS report (Exhibit E to Garris' Response to Court's December 28, 2007 Order [Docket #40]) as well as Deputy Garris' and Deputy DiStefano's sworn affidavits all show that only Deputy Stemboroski and the defendant, Deputy Garris, assisted Deputy DiStefano in the arrest.[8]  No competent evidence supports Green's assertion that he was tasered as many as "twenty" times during his arrest. The ACISS report as well as Deputy Garris and Deputy DiStefano's sworn affidavits all show that the suspect complied with being cuffed after being tasered twice. The amount of force used was not unusual and was therefore objectively reasonable. *See, e.g.,Jones* v. *City of Dothan, Ala,* 121 F.3d 1456 (11th Cir. 1997) (bruising to the suspect's forehead, chest, and wrists was the result of the application of de minimis force in making arrest and therefore would not support a claim for excessive force in violation of the Fourth Amendment).

Green's own description of the events is that "Deputy Kenneth R. Garris deployed his taser and initiated a 'drive stun' *until the Plaintiff complied with being cuffed'"* (Plaintiff's *Notice of Intent to Sue* (emphasis added). In other words, the tasering stopped once Green

---

[7] Green says seven deputies in his Notice of Intent and eight deputies in his Complaint.

[8] The arrest records do show that many individuals witnessed the arrest, and later, many sheriff's personnel were involved in investigating the scene (taking forensic photographs, etc.), but these individuals were not involved in Green's tackle or arrest.

"complied with being cuffed" and the officers were able to effectuate a full custodial arrest.

Under Florida law, opposing or obstructing an officer in the execution of his or her duty is a crime; no violence or offer to do violence is required. Fla. Stat. § 843.02. Under the circumstances of Green's dramatic efforts to avoid arrest, "a reasonable officer in the position of the deputy defendant could have concluded that it was necessary to use force until the [suspect was finally subdued]" (paraphrasing *Lau v. Miller,* Slip Copy, 1999 WL 34803669 (M.D. Fla. 1999)).

The Eleventh Circuit and the Middle District of Florida have upheld uses of force that were greater than the use of the taser in this instance. *See e.g., Nolin v. Isbell,* 207 F.3d 1253, 1257 (11th Cir.2000) (finding force to be de minimis where an officer grabbed the plaintiff "from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him"); *see also Jones  v. City of Dothan,* 121 F. 3d 1456, 1460 (11th Cir.1997) (finding the actual force used and injury inflicted were minor in nature where officers "slammed [plaintiff] against the wall, lacked his legs apart, required him to raise his arms above his head, and pulled his wallet from his pants," causing pain in plaintiffs arthritic knee). In *Lau* v. *Miller,* Slip Copy, 1999 WL 34803669 (M.D. Fla.) the Middle District granted summary judgment despite allegations that deputy defendants grabbed plaintiff in a choke-hold and sprayed chemical agents directly into his eyes causing the plaintiff to have suffered severe physical pain, mental anguish, and permanent facial scarring as a result of the "unreasonable and excessive physical and chemical force utilized."

Many courts have in fact found no Fourth Amendment violation where an officer actually shot a suspect who presented a risk to others. *See, e.g., Brosseau, supra; Cole v.*

14

*Bone,* 993 F.2d 1328,1333 (8th Cir. 1993) and *Smith* v. *Freland,* 954 F.2d 343, 347 (6th Cir. 1992). The suspects in *Smith* and *Brosseau,* just like Green in the instant case, had proven to the courts that they would do almost anything to avoid capture and by that fact itself they posed a major threat. *Id.* Even more on point is the case of *Draper v. Reynolds,* 369 F.3d 1270, 1278 (11th Cir.2004) in which the Eleventh Circuit stated that while being struck by a taser is "unpleasant," the use of a taser was reasonably proportionate to the need for force. *Draper,* 369 F.3d at 1278.

Green's case is also distinguishable from other cases where excessive force has been found because Green had not been handcuffed at the time the force was applied (a point Green himself admits). *See Ferraro,* 284 F.3d 1198-99 (finding excessive force where the plaintiff was already handcuffed when an officer slammed her head on a car); *Priester v. City of Riviera Beach,* 208 F.3d 919, 927 (11th Cir.2000) (concluding that the use of an attack dog on the plaintiff was excessive when the plaintiff was already lying on the ground and the police officer's gun was pointed at the plaintiffs head).

Finally, the Court must consider the third factor: "the extent of the injury inflicted." Here, no evidence exists, other than Green's unsupported statements, that he suffered injuries as a result of the Defendant's actions (as opposed to other possible causes). Second, no evidence exists that any marks that may be attributable to the taser were unusual.

The evidence shows that apprehending Green was difficult. First, Deputy DiStefano had to run Mr. Green off of the road via the PIT maneuver. Thereafter, Green himself describes that he was "tackled by a citizen, Lester A. Rodriguez, and then held face down on the ground by Mr. Rodriguez."

Green points to the photographs attached as Exhibit A to his Complaint as showing

15

the "taser signature/strike marks" (C 5). Green's booking photographs do indeed show cuts on various parts of his body (not just his neck and back -- the areas where Green claims he was tasered) but these photographs do not support the argument that the taser caused any or all of Green's injuries as opposed to any injuries caused by the automobile collision (i.e., the PIT maneuver) or by Green being admittedly "tackled by a citizen, Lester A. Rodriguez, and then held face down on the ground by Mr. Rodriguez" or by any other source.

Even if the Court assumes that the photographs do indeed all show taser signature/strike marks, no evidence shows that such marks are abnormal given the amount of force needed or abnormal with the use of a taser in the drive stun mode (instead, the evidence shows the opposite). In this first regard, if "death" is an acceptable injury when force is needed and used (i.e., as in *Brosseau, Cole* and *Smith supra)* then transient taser marks can hardly be seen as a serious injury.

But more to the point, the use of a taser is not unconstitutional (see, e.g., *Draper, supra).* Therefore, the relevant inquiry is whether Green's alleged injuries are unusual to a taser.  They are not.  A taser works on a battery that supplies electricity to a circuit which boosts voltage while reducing harmful amperage. A taser is meant to use electrodes to deliver electrical pulses into an attacker's nervous system, thereby temporarily incapacitating the attacker. The charge will pass through heavy clothing and skin but is not intense enough to damage the body. A taser typically works in one of two ways. Either probes are fired from the taser at the attacker, or the laser's electrodes are placed directly on the attacker's body (this second method is a "drive stun"). A drive stun is used in close quarters.

In Green's case, the electrodes skipped along the skin-causing the taser to come in contact with the body more than once during the same drive stun. The contact marks (these

16

are not true "burns") shown in the photographs attached to Green's complaint are consistently normal with the use of a taser in the drive stun mode. Often an officer does not have a choice in the location of the electrodes' contact with the attacker's body. (Deputy Garris' Answers to Green's Interrogatories #4, 10, 17 and 18).

Green provides no evidence, other than his own unsupported, self-serving statements, that he has suffered any long term injuries. No evidence exists that Green requires any long term medical treatment for the alleged injuries and he is not seeking compensation for any medical expenses.

Even if Deputy Garris used excessive force during Green's arrest, granting Deputy Garris qualified immunity is still appropriate because the law at the time of the incident would lead a reasonable officer to believe that his conduct was lawful.

Several ways exist to show whether the law was clearly established. The first is to point to a "materially similar case." *Lee,* 284 F.3d at 1198. The second is to "show that a broader, clearly established principle" gleaned from the Constitution, statutes or case law "should control the novel facts in this situation." *Mercado v. City of Orlando,* 407 F.3d 1152, 1159 (11th Cir.2005) *(citing Hope v. Pelzer,* 536 U.S. 730, 741 (2002)). The final way is to show "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of [case law]." *Lee,* 284 F.3d at 1199 *(quoting Priester* v. *City of Riviera Beach,* 208 F.3d 919, 926 (11th Cir.2000)). Under this third test, the law is clearly established only if the standards set forth by the Supreme Court and appropriate case law "inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Id. (quoting Priester,* 208 F.3d at 927).  Appropriate case law in this situation is law

17

as interpreted by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Florida.
*Mercado,* 407 F.3d at 1159. Case law that is "materially similar" must also pre-date the
conduct alleged in the case. *Mercado,* 407 F.3d at 1159 *(quoting Ensley v. Soper,* 142 F.3d
1402, 1406 (11thCir.1998)).

   Green can point to no case law that is so materially similar to the present case as
to give proper notice to Deputy Garris that his conduct was unlawful on May 22, 2005. Deputy
Garris, on the other hand could argue that the case of *Draper v. Reynolds,* 369 F.3d 1270
(11th Cir.), cert. denied, 543 U.S. 988 (2004) (which was decided a year before Mr. Green's
arrest) could lead a reasonable officer to conclude that given the extent of the suspect's efforts
to avoid arrest and the fact that the use of a taser is not per se unconstitutional, and that he
was acting within the law.

   In *Draper,* the defendant officer stopped the plaintiff's truck on the highway after
observing that the truck's tag light was not properly illuminated. *Id.* at 1272. The officer
instructed the plaintiff to meet him behind the truck, a location in view of an activated police
camera. *Id.* Upon arriving behind the truck, the plaintiff shouted and complained about the
officer's shining the flashlight in his face, insisted that he had done nothing wrong, and
behaved in a belligerent manner. *Id.* at 1273. After the officer's continued requests for
documents, he discharged his taser at the plaintiff's chest. *Id.* The plaintiff was handcuffed,
searched, and arrested. *See id.* at 1273-74. The district court granted the defendant officer's
motion for summary judgment with regard to the federal claims. *Id.* at 1274. The Eleventh
Circuit determined that under the circumstances the use of the taser to effectuate the arrest
was reasonably proportionate to the "difficult, tense and uncertain situation" the officer faced
(and the *Draper* officer only faced a traffic stop not a "difficult, tense and uncertain situation"

18

like the dramatic chase scene Green caused). *Id.* at 1277. Like Green, from the time Draper met the officer, he was hostile, belligerent, and uncooperative. Because Draper repeatedly refused to comply with attempted physical handcuffing, the Eleventh Circuit concluded that the situation would likely have escalated an already tense and difficult situation into a serious physical struggle in which someone would be seriously hurt. Thus, the use of a taser was reasonable. *Id.*

While *Draper* may not be directly "on point," it is certainly very close, and to enjoy qualified immunity, public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases. *See Jenkins* v. *Talladega City Bd. of Educ,* 115 F.3d 821, 827 (11th Cir.1997) (en banc) (quoting *Adams v. St. Lucie County Sheriffs Dept.,* 962 F.2d 1563,1575 (11th Cir.1992)); *Jones v. City of Dothan, Ala.,* 121 F.3d 1456 (11th Cir. 1997).

### Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *See DA Mortgage, Inc. v. City of Miami Beach*, 486 F.3d 1254, 1265 (11th Cir. 2007). A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case. *See Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001)(citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its

own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.  *See Porter v. Ray*, 461 F.3d 1315, 1321 (11th Cir. 2006)(citation omitted).

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  *See Samples on behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988).  Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion.  *See Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).  A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The facts and circumstances of this case are such that the amount of force Deputy Garris used cannot be said to be objectively unreasonable. Under the circumstances, a reasonable officer in Deputy Garris' position could have concluded that using the taser as he did was necessary to subdue and handcuff Green. Furthermore, "reasonable doubt" exists as to whether the amount of force used, even if unnecessary, was unlawful under the then existing case law. Defendant Deputy Garris is entitled to summary judgment based on qualified immunity.

Accordingly, the Court orders:

1. That Defendant Garris' motion for summary judgment based on qualified

immunity (Doc. No. 50) is granted.

2. That Plaintiff Green's motion for summary judgment (Doc. No. 49) is denied.

The Clerk is directed to enter judgment for Defendant Garris and against Plaintiff Green and to close this case.

ORDERED at Tampa, Florida, on May 28, 2008.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Counsel of Record
Brett H. Green